**Electronically Filed
Intermediate Court of Appeals
CAAP-13-0004020
30-DEC-2014
08:51 AM**

NOS. CAAP-13-0006029 and CAAP-13-0004020

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

TERRI POLM, INDIVIDUALLY, AND AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF B.M.,
Plaintiff-Appellee,
v.
DEPARTMENT OF HUMAN SERVICES, STATE OF HAWAI'I,
Defendant-Appellant,
and
MATTHEW MCVEIGH and DOE DEFENDANTS 1-10,
Defendants

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 11-1-0548)

MEMORANDUM OPINION
(By: Foley, Presiding J., Leonard and Reifurth, JJ.)

Defendant-Appellant Department of Human Services, State
of Hawai'i (**DHS**) appeals from the September 17, 2013 Final
Judgment and the December 3, 2013 First Amended Final Judgment,
both entered in the Circuit Court of the First Circuit[1] (**circuit
court**).

On appeal, DHS contends that sixteen of the circuit
court's seventy-one Findings of Fact (**FOF**) are clearly erroneous
and eight of the circuit court's thirty-seven Conclusions of Law
(**COL**) are wrong. Although not raised in its points on appeal,
DHS also contends (1) that a third-party's actions constituted a
superseding, intervening criminal act so to limit DHS's liability
and (2) that the circuit court awarded damages that were not
supported by the evidence.

---

[1] The Honorable Gary W.B. Chang presided.

## I.  BACKGROUND

The minor decedant (**Decedent**) was born on July 8, 2008 in Honolulu, Hawai'i to Matthew McVeigh (**Mr. McVeigh**) and his wife, April McVeigh (**Mrs. McVeigh**) (together, **McVeighs**).  The McVeighs also had a daughter (**Daughter**) who was approximately two years old when the Decedent was born.

On or about August 22, 2008, the Decedent's primary care physician, Naro L. Torres, M.D. (**Dr. Torres**), saw the Decedent because he was acting fussy with apparent pain and inability to use his right arm.  Dr. Torres requested the McVeighs take the Decedent to the Kapi'olani Medical Center for Women and Children (**KMCWC**) to have his arm examined.  The Decedent was diagnosed with a fractured right humerus (upper arm).  When questioned about how the Decedent sustained the injury, the McVeighs told the staff at KMCWC that they did not know what caused his injury and that the only possible cause might have been an automobile accident that occurred on or about August 13, 2008.  The staff at KMCWC rejected the McVeighs' automobile accident explanation, however, because the nature of the Decedent's injury was not consistent with the McVeighs' timeline of events.

In response to the Decedent's injury, KMCWC conducted a Multi-Disciplinary Team (**MDT**) case conference that included various professionals, such as Guardian Ad Litems and Volunteer Guardian Ad Litems (**VGAL**), social-workers, military representatives, and medical staff.  The MDT determined that the Decedent had likely suffered abuse resulting in his fractured arm.  The perpetrator of the Decedent's injury was not identified.

Because there was no adequate explanation for the Decedent's injury, the Honolulu Police Department was contacted and a case was opened with Child Welfare Services (**CWS**) of the DHS for suspected severe child abuse and neglect.  On August 23, 2008, the Decedent and the Daughter were removed from the McVeighs' household and placed in the custody of DHS.  A supervised case was instituted in the Family Court of the First Circuit (**family court**) and the McVeighs signed a voluntary relinquishment of custody of the Decedent and the Daughter.  The

family court appointed a VGAL for the Decedent and a VGAL social worker, Jessie Addison (**Addison**).

Based on recommendations from CWS, the family court placed various conditions on both the McVeighs. The family court required that Mr. McVeigh attend anger management and parenting classes and that Mrs. McVeigh undergo drug rehabilitation for her methadone addiction.

On or about February 25, 2009, DHS returned the Decedent and the Daughter to the McVeigh home under continued DHS supervision and monitoring. Gwenson Yuen (**Yuen**) took over as case manager for the McVeighs' case in February 2009, the same month that the Daughter and the Decedent were returned to the McVeigh household. As a DHS case manager, Yuen was responsible for insuring that the McVeighs complied with the conditions CWS imposed and was responsible for the safety of the Decedent and the Daughter. Yuen worked out of the Leeward Branch of the Child Protective Services (**CPS**) Department of DHS. His supervisor at the time was Jalene-Ann Mastin (**Mastin**), a social worker who holds a master's degree in social work.

On June 19, 2009, approximately four months after the Decedent was returned to the McVeigh household, Yuen and Addison observed a bruise to the corner of the Decedent's left eye and left cheek area (**June 19 bruise**). Upon questioning, Mr. McVeigh explained that the Decedent had fallen when he was learning how to walk and hit the corner of a table. Yuen did not personally visit the McVeigh house to ascertain whether Mr. McVeigh's story was credible.

Addison, as the Decedent's VGAL social worker, kept careful notes of the injury. Yuen, however, did not log the June 19 bruise into the CPS mandatory record keeping system (**CPSS**) as required pursuant to the DHS's codified procedures called the Green Book. In addition, Yuen did not perform a "Child Risk Assessment" using the Child Risk Assessment Matrix.

On August 4, 2009, Mr. McVeigh took the Decedent to the Makalapa Naval Health Clinic (**Makalapa Clinic**) and saw Nuzhat Bokhari, M.D. (**Dr. Bokhari**) because the Decedent exhibited cold symptoms. Dr. Bokhari examined the Decedent and ordered x-rays to rule out any bony lesions to the Decedent's old fractured arm,

3

which was ruled out. Dr. Bokhari diagnosed the Decedent with an upper respiratory infection and prescribed medications.

On August 5, 2009, at approximately 1:01 p.m., Yuen recorded the following into the DHS Log of Contacts:

> Consult with Elliot Plourde in Intake. [Yuen] followup with report of re-harm.

> The Decedent taken to the [Makalapa Clinic]. Nurse, Lt. Lisa Barnes reports [y]esterday visit with [the Decedent] for sore throat. Medicine given to father, [Mr. McVeigh]. Nurse reports x-ray yesterday also taken. Shows only old fractures. Nurse confirms no abuse or neglect. Child released to father. (Note: PCP Dr. Nuzhat [Bokhari]).

> Report back to Elliot Plourde status of Makalapa Clinic.

Also on August 5, 2009, at approximately 1:45 p.m., a report of concern (**August 5 Report**) was made to DHS intake worker, Elliot Plourde (**Plourde**), with the CPS Hotline. The caller was the Decedent's babysitter, Keysha Cordona (**Cordona**). Cordona reported that she had been babysitting the Decedent and the Daughter the past two months. She reported the following:

> (1) Approximately one (1) month ago (early July 2009), [Cordona] observed a black eye on [the Decedent]. When questioned by [Cordona], Mr. McVeigh stated that "[the Decedent] fell while learning to walk."

> (2) Approximately two (2) weeks ago, [Cordona] observed a "1 inch long L shaped bruise/red mark on [the Decedent's] right temple." When questioned by [Cordona], Mr. McVeigh stated "he fell."

> (3) Approximately 1 or 2 weeks ago, [Cordona] observed a "½ inch long bruise between [the Decedent's] right index finger and thumb and a small bruise on his right wrist." When questioned by [Cordona], Mr. McVeigh said that [the Decedent] must have fallen or bumped his hand on something.

Plourde recorded Cordona's report of possible re-harm in the August 5 Report. In that five page report, Plourde noted the following "recent concerns":

> (1) [The Decedent] was fussy on 8/3/09. [The Decedent] reportedly would not drink his bottle but did eat baby food. Concerns were reported to Mr. McVeigh when he picked up [the Decedent and Daughter].

> (2) On 8/4/09, [the Decedent] was noted to be fussy again and [could] be "coming down with something." [Cordona] called Mr. McVeigh and asked him to take [the Decedent] to the doctor as he was not well.

> (3) Mr. McVeigh reportedly made an appointment for 8/5/09 at 1330 hours, but changed it to 8/4/09. [Cordona] reported that Mr. McVeigh took [the Decedent] to the Makalapa Clinic on 8/4/09 and "had a few x-rays and was prescribed amoxicillin." Mr. McVeigh returned

4

> [the Decedent] to the babysitter and he returned to work.
>
> (4)    On 8/5/09, [Cordona] observed [the Decedent] to be "fussy and unable to hold his bottle or lift his arms.

The concern regarding the Decedent's inability to lift his arms prompted Cordona to call the CPS Hotline on August 5, 2009.

After the August 5 Report, Plourde recommended that the Decedent be seen by his primary care physician and undergo a complete body examination for possible re-harm. The examination would determine if the Decedent was being abused and the extent of his injuries, including what was wrong with his arms or shoulders. The circuit court determined that there is no credible evidence that Mr. McVeigh ever took the Decedent to visit the Makalapa Clinic on August 5, 2009 pursuant to Yuen's direction.[2]

In addition, even though the Green Book required the August 5 Report be referred to the assessment (investigation) CWS unit, Yuen told Plourde that he would look into the matter himself and did not refer the August 5 Report to the assessment unit. Instead, Yuen told Plourde that he would let Plourde know whether or not a new intake should be opened. Furthermore, Yuen did not perform an assessment of the Decedent using the Child and Family Assessment Matrix, DHS 1517 and did not report the August 5, 2009 reported bruises to the VGAL social worker, Addison.

On September 18, 2009, the Decedent, then 14 months old, was found unresponsive, limp, and not breathing in his crib. The Decedent was taken to KMCWC and where died two days later on September 20, 2009. The cause of death was determined to be intracranial injury due to abusive head trauma. The Decedent's

---

[2]    During the trial, Yuen testified that "when he learned of [Cordona's] concerns, he instructed Mr. McVeigh on August 5, 2009 to take [the Decedent] to the Makalapa Clinic to be examined and that Mr. McVeigh complied." He also testified that "he spoke to Nurse Barnes, who confirmed that there was no abuse to, or neglect of, [the Decedent]." Yuen's testimony is inconsistent with the evidence in the record. At 1:01 p.m. on August 5, Yuen recorded in the DHS Log of Contacts that he (1) spoke to nurse Lt. Lisa Barnes at the Makalapa Clinic and that (2) she reported "no abuse or neglect." His entry could not have been a follow-up to his instructions to Mr. McVeigh to have [the Decedent] examined for possible re-harm because the August 5 Report of re-harm was not made until 1:45 p.m. of the same day. Based on the evidence admitted, the circuit court concluded that Yuen's August 5, 2009 entry into the Log of Contacts referred to [the Decedent's] August 4, 2009 doctor's visit for a cold and not for a body examination for possible re-harm.

head trauma resulted from Mr. McVeigh violently shaking or striking him, which caused his brain to be impacted by the inside of his skull. There was no evidence as to how much shaking or striking was involved or how long the shaking or striking lasted. The medical examiner indicated the Decedent would have become unresponsive at, or close to, the time that his head injury was inflicted. Mr. McVeigh was convicted in the United States Navy General Court Martial of the following crime:

> Matthew R. McVeigh did on or about 18 September 2009, by culpable negligence, while perpetrating an offense directly affecting the person of [the Decedent], to wit: a battery, unlawfully kill [the Decedent] by striking the head and shaking the body of [the Decedent] with his hands. (Ellipses and brackets omitted.)

On March 18, 2011, the Decedent's grandmother, Terri Polm (**Polm**) filed a Complaint in this wrongful death action[3]

---

[3] Hawai'i's wrongful death statute is found in Hawaii Revised Statutes (**HRS**) § 663-3 (Supp. 2013), which provides:

> **§ 663-3. Death by wrongful act.** (a) When the death of a person is caused by the wrongful act, neglect, or default of any person, the deceased's legal representative, or any of the persons enumerated in subsection (b), may maintain an action against the person causing the death or against the person responsible for the death. The action shall be maintained on behalf of the persons enumerated in subsection (b), except that the legal representative may recover on behalf of the estate the reasonable expenses of the deceased's last illness and burial.
>
> (b) In any action under this section, such damages may be given as under the circumstances shall be deemed fair and just compensation, with reference to the pecuniary injury and loss of love and affection, including:
>
> (1) Loss of society, companionship, comfort, consortium, or protection;
>
> (2) Loss of marital care, attention, advice, or counsel;
>
> (3) Loss of care, attention, advice, or counsel of a reciprocal beneficiary as defined in chapter 572C;
>
> (4) Loss of filial care or attention; or
>
> (5) Loss of parental care, training, guidance, or education, suffered as a result of the death of the person;
>
> by the surviving spouse, reciprocal beneficiary, children, father, mother, and by any person wholly or partly dependent upon the deceased person. The jury or court sitting without jury shall allocate the damages to the persons entitled thereto in its verdict or judgment, and any damages recovered under this section, except for reasonable expenses of last illness and burial, shall not constitute a part of the estate of the deceased. Any action brought under this section shall be commenced within two years from the date of death of the injured person, except as otherwise provided.

against DHS and Mr. McVeigh on behalf of herself and the Decedent's estate, alleging that DHS was negligent in its oversight of the Decedent's case. On May 6, 2013, the circuit court dismissed Polm's individual claim under HRS § 663-3 and Polm's claim for negligent infliction of emotional distress. Polm's remaining claims on behalf of the Decedent's estate proceeded to a five day non-jury trial beginning July 2, 2013.

On August 7, 2013, the circuit court entered its Findings of Fact and Conclusions of Law and Order finding DHS 50% liable of the total awarded amount of $250,000.00 in damages to Polm, as personal representative of the Decedent's estate. The circuit court determined that DHS had a duty

> (1) [to] provide [the Decedent] with competent prompt, and ample protection from harm, (2) to prepare and maintain required information in DHS's records, and (3) to conduct an appropriate and professionally competent investigation pursuant to [HRS] Chapter 587 (the Child Protective Act), the Hawaii Administrative Rules [(**HAR**)], and the Green Book following the [August 5 Report] of apparent potential serious re-harm to [the Decedent] made by babysitter [Cordona].

The circuit court further determined that,

(1) under principles of respondeat superior, DHS breached its duty to the Decedent when it did not adequately investigate the August 5 Report of re-harm to the Decedent, did not investigate the circumstances relevant to the reported bruises stated in the August 5 Report, and did not follow the procedure set forth in DHS's own Green Book;

(2) that DHS's failure to properly document the Decedent's June 19 bruise was negligent because when DHS received the August 5 Report, DHS staff and social workers did not realize that the report pertained to a different injury or new harm than the June 19 bruise;

(3) that DHS was negligent when it failed to inform the VGAL of the Cordona's August 5 Report; and

(4) that the DHS's negligence was a legal cause of the Decedent's death.

The circuit court awarded damages for conscious pain and suffering and the loss of enjoyment of life to Polm, as representative to the Decedent's estate. On September 17, 2013, the circuit court entered its Final Judgement (**Final Judgment**).

On October 21, 2013, DHS filed its notice of appeal from the Final Judgment, in case no. CAAP-13-0004020. On November 12, 2013, the circuit court entered its "Order Granting in Part and Denying in Part 'Plaintiff's Motion to Alter or Amend Judgment,' Filed September 24, 2013," (**Amended Judgment**) in which Polm was awarded additional costs of $2,651.37, jointly and severally against Mr. McVeigh and DHS, and $4,856.06, severally against DHS. On December 3, 2013, entered the First Amended Final Judgment.

On December 11, 2013, DHS filed a second Notice of Appeal from the Final Judgment and the First Amended Final Judgment in this instant proceeding, case no. CAAP-13-0006029. On January 21, 2014, case no. CAAP-13-0006029 and case no. CAAP-13-0004020 were consolidated under case no. CAAP-13-0006029.

## II. STANDARD OF REVIEW

### A. Findings of Fact

"In this jurisdiction, a trial court's FOFs are subject to the clearly erroneous standard of review. An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction that a mistake has been committed." Chun v. Bd. of Trs. of the Employees' Ret. Sys. of the State of Hawai'i, 106 Hawai'i 416, 430, 106 P.3d 339, 353 (2005) (internal quotation marks, citations, and ellipses omitted). "An FOF is also clearly erroneous when the record lacks substantial evidence to support the finding. [The Hawai'i Supreme Court has] defined 'substantial evidence' as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Leslie v. Estate of Tavares, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999) (internal quotation marks and citations omitted).

### B. Conclusions of Law

> A COL is not binding upon an appellate court and is freely reviewable for its correctness. [The appellate] court ordinarily reviews COLs under the right/wrong standard. Thus, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned. However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case.

Chun, 106 Hawai'i at 430, 106 P.3d at 353 (internal quotation marks, citations, and brackets in original omitted).

### III.  DISCUSSION

**A.    The circuit court's FOFs were not clearly erroneous.**

DHS contends the following FOFs are clearly erroneous: 20, 21, 23, 29, 31, 32, 35, 37, 39, 44, 47, 48, 57, 60, 62, and 67.

#### 1.   FOF 20

> 20.  Although Gwenson Yuen had the title of "social worker", Mr. Yuen was not a licensed social worker nor did Mr. Yuen ever obtain any college degrees in the area of social work or ever attend any college or university courses in social work; all of Mr. Yuen's social worker training was on the job.  As a social worker for a governmental agency, Mr. Yuen was not required to be licensed as a social worker.

DHS contends that "[t]he court simply was wrong – the uncontradicted evidence was [Yuen's] testimony that his 'title was CASP, child abuse specialist . . . I was not a social worker. . . . I have not been a social worker, by that title.'" While Yuen did testify that his title was child abuse specialist, even Yuen often referred to himself as a social worker during his testimony.  Thus, even if DHS's contention is true, we fail to see how such an error prejudiced DHS and hold that the error would have been harmless.  See Hawaii Rules of Evidence Rule (**HRE**) 103(a) (Supp. 2013).

#### 2.   FOF 21

> 21. [Yuen] did not consider that the Decedent was removed from the McVeigh household due to suspected child abuse, even though it was contained in the case files and records of [the Decedent] and [Daughter].  He thought [the Decedent] was removed because of neglect.

DHS contends "[Yuen] actually testified that his understanding when he received the case was that 'neither [parent] can be ruled out as the perpetrator of harm [the broken arm].'"  (Brackets in original.)

There is substantial evidence in the record to support the circuit court's finding that Yuen believed the children were removed because of neglect.  Yuen was asked on direct if the case was a neglect case, Yuen answered, "The issues were supported by the family service plan, which pointed to parenting classes, which would point to neglect issues."  In addition, several other witnesses testified that, based on Yuen's deposition, he

9

misunderstood the Decedent's case to be a neglect case. "[I]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." Inoue v. Inoue, 118 Hawai'i 86, 101, 185 P.3d 834, 849 (App. 2008) (internal quotation marks and citations omitted). FOF 21 is not clearly erroneous.

### 3. FOF 23

> 23. The VGAL social worker kept careful notes of the injury; however, [Yuen] did not log the injury (including its location and description) into the CPS mandatory record keeping system known as CPSS, which was required so that any social worker or CPS worker at any time, when checking [the Decedent's] case on the CPSS, would be able to see his case history including the details of any injury or abuse and reports of harm. [Yuen] also did not perform a "Child Risk Assessment" using the Child Risk Assessment Matrix and complete the required DHS forms such as DHS 1507 ("Report [of harm] On Active Case" ("Case Management Case")) or form DHS 1506 ("Report on Active Case" ("Assessment Case") [sic] for the June 19, 2009 left black eye/cheek injury to [the Decedent].

On appeal, DHS does not argue that Yuen did, in fact, perform a "Child Risk Assessment" using the Child Risk Assessment Matrix. Instead, DHS contends that "[Yuen] was not required to complete such an assessment matrix since the doctor had confirmed that there was no abuse or neglect." DHS's argument is an attempt to justify why Yuen did not perform an assessment using this matrix. Insofar as DHS does not present a discernible argument challenging the facts contained in FOF 23, we deem DHS's challenges to this finding waived. See Kahoʻohanohano v. Dep't of Human Servs, State of Hawaii, 117 Hawai'i 262, 297 n.37, 178 P.3d 538, 573 n.37 (2008); see also Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 28(b)(7) ("Points not argued may be deemed waived.").

### 4. FOFs 29, 31, 32, and 39

> 29. The August 5, 2009 entries in the Log of Contacts by social worker [Yuen] and intake worker [Plourde] is confusing and shows the inaccuracy and sloppiness of DHS record-keeping. It is not possible for [Yuen] to have had a conversation with [Plourde] on August 5, 2009 at 1:01 p.m. about a "report of re-harm" that was not made until 1:45 that same day. DHS did not offer any plausible explanation of this anomaly in the Log of Contacts record. Logic and common sense dictates that CPS intake worker, [Plourde], who received the emergency call from [Cordona] at 1:45 p.m. on August 5, 2009, could not have reported [Cordona's] concerns to [Yuen] until sometime after 1:45 p.m. on August 5, 2009. Therefore, either [Plourde's] report of his conversation with [Cordona] at 1:45 p.m. is wrong or [Yuen's] report of

his activities at 1:01 p.m. is wrong. However, in either event, DHS failed to offer any candid explanation for the confused state of the record in its Log of Contacts for August 5, 2009.

. . . .

31. [Yuen] reported in the August 5, 2009 Log of Contacts that he spoke to nurse Lt. Lisa Barnes, who reported "no abuse or neglect." This conversation was not based upon an August 5, 2009 visit by [the Decedent] to the Makalapa Clinic in response to the August 5, 2009 report by babysitter [Cordona]. Lt. Barnes' report is based upon [the Decedent's] August 4, 2009 visit to the Makalapa Clinic for a cold, not for possible re-harm or injury. The [circuit] court knows this to be true because, in [Yuen's] August 5, 2009 Log of Contacts entry, he states: "Nurse, Lt. Lisa Barnes reports <u>yesterday</u> visit with [the Decedent] for sore throat. . . . Nurse reports x-ray <u>yesterday</u> also taken. Shows only old fractures. Nurse confirms no abuse or neglect. [The Decedent] released to father." Exhibit O at page 000764 (emphasis added). "Yesterday refers to August 4, 2009, not August 5, 2009.

What is curious is that [Yuen] appeared to rely upon an opinion by Lt. Barnes of "no abuse or neglect" that is based upon an August 4, 2009 wellness examination and not an August 5, 2009 possible re-harm or injury evaluation. This indicates that (1) [Yuen] erroneously relied upon a statement by Lt. Barnes of "no abuse" that was not based upon the August 5, 2009 report of concerns by babysitter [Cordona] and (2) [Yuen] did not successfully arrange to have Mr. McVeigh take [the Decedent] to be examined by a medical professional in response to [Cordona's] August 5, 2009 reports of concerns. The [circuit] court finds that [Yuen] either (1) miscommunicated with Lt. Barnes, (2) failed to verify with Lt. Barnes that Mr. McVeigh followed through with his direction to take [the Decedent] to see the doctor on August 5, 2009, (3) improperly relied exclusively upon information from Mr. McVeigh that he took [the Decedent] to see a doctor on August 5, 2009 and that Lt. Barnes informed him that there was no abuse without verifying Mr. McVeigh's information, or (4) is misrepresenting the substance of his August 5, 2009 Log of Contacts entry regarding an August 5, 2009 visit to Makalapa Clinic and what Lt. Barnes stated. In any event, the [circuit] court finds that any statement of "no abuse" that is attributed to Lt. Barnes has no basis in fact and any reliance by DHS upon what Nurse Barnes is alleged to have stated was erroneous, baseless, ill-advised, and constituted malfeasance.

32. [Plourde] recommended on August 5, 2009 that [the Decedent, then 13 months old, be seen by his primary care physician and undergo a complete body examination to determine whether [the Decedent] was being abused and the extend of [the Decedent's] injuries, including what was wrong with [the Decedent's] arms/shoulders.

. . . .

39. [Yuen] was not an assessment worker, not trained in assessment, and did not refer the report of harm received on August 5, 2009 to the assessment unit, nor did [Yuen] review the August 5, 2009 report with the assessment unit supervisor, [Mastin] which was also required by the DHS Green Book. Rather, [Yuen] concluded, based upon faulty or erroneous information, that the August 5, 2009 report of

harm from [the Decedent's] babysitter did not warrant an investigation regarding [the Decedent's] safety. He did not initiate a new intake to inquire into or investigate whether other action or intervention was appropriate to provide for [the Decedent's] safety.

[Yuen] placed near-exclusive, almost mechanical reliance upon a medical opinion of re-harm in order to determine whether he should initiate a new intake. He did not speak of participating in making a qualitative determination in conjunction with his supervisor regarding whether a new intake or other investigatory or protective action should have been taken in response to [Cordona's] report. He testified that even if he knew that the August 5, 2009 report of injuries constituted new injuries to [the Decedent], he would have initiated a new intake if there was a medical opinion of re-harm. He did not speak in terms of the intricate and qualitative decision making process that the Green Book established for the protection of at-risk children in need of protection. [Yuen's] approach effectively defers the new intake initiation decision making to medical personnel, who in this case did not have the complete information if they did, in fact, examine the Decedent] on August 5, 2009 pursuant to [Cordona's] report. This is an unacceptable departure from the qualitative process of data evaluation, investigation, and assessment of child safety that the Green Book establishes.

DHS provides no discernible argument as to why these FOFs are clearly erroneous. Thus, we deem DHS's challenge to these findings waived. See Kaho'ohanohano, 117 Hawai'i at 297 n.37, 178 P.3d at 573 n.37; see also HRAP Rule 28(b)(7).

5.    FOF 35

FOF 35 states that "[Yuen] did not perform an assessment of [the Decedent] using the Child and Family Assessment Matrix, DHS 1517, as required by the Green Book." DHS argues that "[t]he uncontradicted evidence was that the matrix was to be used by the intake section, not by [Yuen]."

In the circuit court's unchallenged FOF 38, the circuit court considered this exact argument and determined that "there is no question that all of the requirements set forth in the Green Book did apply to, and bind, defendant DHS." The circuit court determined that Yuen's disclaimer that Section 7 of the Green Book did not apply to him "neither vindicate[d] or provide[d] anything of probative value to the [circuit] court." Section 7.3.1(A)(3) of the Green Book specifically requires that "[a]ll reports on active child protection cases, regardless of the age of the child, will be assessed by using the Child and Family Assessment Matrix, DHS 1517." DHS does not dispute these findings and they are, therefore, binding on this court. See

Okada Trucking Co., Ltd. v. Bd. of Water Supply, 97 Hawai'i 450, 459, 40 P.3d 73, 82 (2002). The circuit court did not clearly err in finding that the Green Book required an assessment of the Decedent and that no assessment was conducted.

6.    FOF 37

37. According to the DHS Green Book § 7.3.1.B for reports of harm or threatened harm to a child who is already under DHS supervision for prior abuse, "[i]f the report meets the criteria for investigation pursuant to departmental procedures, the report needs to be sent to an assessment CWS unit for immediate crisis intervention response." Green Book § 7.3.2.B further provides:

**All** reports on active cases that warrant investigation shall be sent to the assessment (investigation) CWS unit for appropriate action. . . .

The only role of the assessment CWS social worker for reports of re-harm is to either confirm or not confirm the report and insure the safety of the child. . . .

**All** reports are to be sent to the assessment CWS unit supervisor for review and assignment pursuant to unit procedures. . . .

(Brackets and emphases in original.)

DHS does not challenge the accuracy of the circuit court's recitation of Sections 7.3.1(B) and 7.3.2(B) of the Green Book. Instead, DHS contends that "[s]ince the Makalapa [C]linic had not found any child abuse or neglect there was no indication of 'reharm' and that the babysitter's call had been unsubstantiated; thus there was no basis for a new intake." DHS's argument attempts to justify why DHS did not initiate a new intake for the Decedent and does not dispute the facts contained within FOF 37. DHS provides no discernible argument as to why FOF 37 is clearly erroneous and, therefore, DHS's challenge to FOF 37 is deemed waived. See Kaho'ohanohano, 117 Hawai'i at 297 n.37, 178 P.3d at 573 n.37; see also HRAP Rule 28(b)(7).

7.    FOF 44

44. [Yuen] did not report and record the location and description of [the Decedent's] [June 19 bruise] into the mandatory CPSS reporting system. Had he done so, he and other DHS employees or agents, including [Mastin], could have realized on August 5, 2009, that there was evidence of multiple incidents of black eyes to [the Decedent]. Such information would indicate possible severe, ongoing physical abuse to [the Decedent], which would have resulted in the initiation of a crisis response or new intake on Augsut 5, 2009.

DHS contends that "[t]he [circuit court's] finding is pure speculation regarding what more likely than not would have happened since (i) there was no expert testimony regarding what likely would have occurred, and (ii) there was no evidence of 'multiple incidents of black eyes,' but, rather one incident that the guardian ad litem and the social worker agreed did not result from child abuse or neglect and an unsubstantiated report made one month after an alleged incident." (Emphasis omitted.)

There is substantial evidence in the record to support the circuit court's finding of what would have happened if Yuen properly recorded the Decedent's injuries. Yuen testified that the CPSS registry system is "a logging system that the social workers and the administration supervisors use, so that [they're] all on the same page." Yuen also agreed that one of the purposes of the CPSS registry system was "so that any worker, case worker for [DHS], who has any contact or involvement with the children's case, can go into the CPSS system and see whatever has occurred leading up to that point[.]" DHS does not dispute that Yuen did not log the June 19 bruise in to the CPSS system. Similarly, Polm's expert witness, Heidi Staples (**Staples**), a social worker and the director of the Center for Child Welfare employed my the University of California Los Angeles, testified that the documentation in the Decedent's case was "shockingly limited" and "absolutely not" sufficient.

On appeal, DHS does not challenge the following: (1) from FOF 41, Yuen did not know the black eye reported by the Decedent's babysitter, Cordona, on August 5, 2009 was a new and different injury from the Decedent's June 19 bruise; (2) from FOF 41, Yuen's failure to log the June 19 bruise in the CPSS system as one explanation for why he did not know that the bruises reported in Cordona's August 5 Report were new injuries; (3) from FOF 43, Yuen's supervisor, Mastin, was also unaware that the Decedent sustained the new injuries that were in the August 5 Report because the June 19 bruise was not properly recorded in the CPSS system; and (4) from FOF 42 and 43, had Yuen or Mastin known of the possible re-harm to the Decedent, they would have initiated a crisis response.

"It is well settled that the [circuit court], sitting as the trier of fact, is free to make all reasonable and rational inferences under the facts in evidence, including circumstantial evidence." See Estate of Klink ex rel. Klink v. State, 113 Hawai'i 332, 352, 152 P.3d 504, 524 (2007) (internal quotation makes and citation omitted). The circuit court reasonably inferred that if Yuen had properly logged the June 19 bruise in the CPSS system, other DHS employees could have determined that the August 5 Report of bruises were new and different from the Decedent's June 19 bruise and, therefore, would have initiated a crisis response. FOF 44 is not clearly erroneous.

        8.   FOFs 47 and 48

> 47.   The information regarding the [June 19 bruise] was not properly and timely reported by the intake worker or the social worker as required by law to appropriate child welfare professionals or to the [family court].

> 48.   The information regarding the July 2009 black eye, which was reported on August 5, 2009 by babysitter [Cordona], was not properly and timely reported by the social worker as required by law to other appropriate child welfare professionals or to the [family court].

> The information regarding [the Decedent's] July 2009 black eye, which was reported by [Cordona], should have been reported to the [family court] in the September 21, 2009 Safe Family Home Report. However, it was not included in that report. [Family court] . . . ordered an investigation into the August 5, 2009 report of a black eye to [the Decedent].

> DHS investigated the matter and prepared a Safe Family Home Report dated September 27, 2009, which reported to the [family court] for the first time, the information [Cordona] reported to DHS on August 5, 2009.

> Although the DHS Safe Family Home Reports of September 21 and 27, 2009 were both prepared after [the Decedent] died on September 20, 2009, the failure to report [the Decedent's] July 2009 black eye until [family court] ordered an investigation into the July 2009 black eye incident, together with the failure of the social worker to report critical information to the VGAL, the VGAL social worker, and supervisor Mastin indicate a failure of DHS to properly document and report significant, relevant information, and support the finding and conclusion that DHS breached its duty to ensure the proper implementation of the standards established by the Green Book and the law that applies to child welfare matters.

On appeal, DHS contends that "[t]here is no basis to report to the Family Court regarding an unsubstantiated report. Should this [c]ourt rule that in the future DHS refer every unsubstantiated report of child abuse or neglect to the Family Court, and should the Legislature agree to provide funding for

the additional employees that DHS would need to undertake that work, DHS would comply."

The circuit court found that Yuen did not properly record the June 19 bruise in the CPSS system and did not investigate or assess Cardona's August 5 Report of bruises as required under the Green Book. Staples testified that the "case carrying social worker" is required to investigate reports of harm, but that the policy in place also requires the intake or assessment worker to investigate the reports of harm. This policy was a "checks-and balances-situation, to make sure that serious injuries, especially to cases that were already active, were thoroughly investigated." Yuen concluded, based on faulty information, that no investigation was necessary without consulting someone trained in assessment and without reviewing that report with Mastin, the assessment unit supervisor, as required under the Green Book. The circuit court found that Yuen did not follow the established policy.

There is evidence in the record showing that the errors in the handling of the Decedent's case was not the result of lack of staffing or funding, but, instead, was the result of Yuen's failure to follow the reporting procedures in the Green Book. Staples testified that "[t]here were skilled people in [DHS]" and that "the supervisor was one of them, but they weren't being given the information by [Yuen], so they couldn't follow up on all these red flags." Insofar as Yuen did not follow Green Book procedures to determine whether the reports of re-harm were unsubstantiated, FOFs 47 and 48 are not clearly erroneous.

9.    FOF 57

57. The failure [of] DHS to properly document injuries to [the Decedent] and to properly disseminate such information to other child welfare professionals working on [the Decedent's] case was a substantial factor that prevented the intricate and extensive procedures established by the Green Book and the applicable law to be engaged to provide for the protection of [the Decedent] in the instant case.

Competent and consistent documentation and communication are critical in high risk cases such as [the Decedent's] case. DHS failed to perform competent and consistent documentation and communication by and between various DHS employees, other child welfare professionals, and the [family court].

DHS employees and agents also failed to exercise reasonably appropriate judgment in its handling of [the

16

Decedent's] case. DHS employees' failures actually prevented or hampered other child welfare professionals from doing their jobs to protect [the Decedent].

DHS contends that "[t]here was no expert testimony to support the Finding of a 'substantial factor'" and that "[t]here is no evidence that 'DHS employees' failures actually prevented or hampered other child welfare professionals from doing their jobs to protect [the Decedent]." (Emphasis omitted.) We disagree.

There is substantial evidence in the record to support the circuit court's determination that Yuen's failure to follow the procedures in the Green Book was a substantial factor in preventing the Decedent from receiving necessary protection. Polm's expert witness, Staples, testified that Yuen's lack of oversight and decision to not assign the case to the assessment unit "prevented others from following policy and from stepping in and possibly saving this child[.]" Staples based her opinion specifically on her review of DHS's policy on how new referrals to the agency should be handled on active cases. The VGAL social worker, Addison, also stated that "[t]he approach of [her] unit is always more on the conservative side" and, in instances of confirmed abuse, her unit follows the "approach of removing the children from the home, until such time either the [family court] determines, or the medical professionals determine, exactly what happened." We decline to review the circuit court's credibility determination. See Inoue, 118 Hawai'i at 101, 185 P.3d at 849. FOF 57 is not clearly erroneous.

10. FOF 60

60. DHS relied excessively and improperly upon a Navy social worker's home visits and upon DHS office visits in place of home visits by [Yuen]. DHS failed to make necessary home visits with its own social workers, thereby compromising the accuracy of DHS's assessment and evaluation of the safety of [the Decedent's] home environment. This is particularly true in the instance case because the question regarding whether Mr. or Mrs. McVeigh caused the fracture to [the Decedent's] arm in 2009 was never answered and the only possible explanation for that injury offered by the McVeighs (a motor vehicle accident) was medically ruled out as a possible cause of that injury.

DHS contends that "[t]here was no expert testimony to support the Finding that 'DHS relied excessively and improperly' on a Navy social worker's home visits nor that home visits by the

17

Navy social worker and office visits with the DHS social worker compromised 'the accuracy of DHS's assessment and evaluation.'" In support of its contention, DHS reasons that "[t]he capacity of DHS social workers to make as many visits as they would like to make and their reliance on the sometimes better trained federal social workers are direct results of Legislative decisions regarding funding of DHS positions."

While Section 4.7.1(A)(2) of the Green Book indicates that face-to-face contacts may be made by other CWS staff or by private service providers, it also indicates that "[t]he CWS social worker will have the ultimate responsibility to evaluate the risk factors in the home based on the reports of others and well as [sic] himself/herself." The Green Book explicitly states that "[t]he CWS social worker needs to be the main evaluator of the family home and situation." Staples and Grant Teruya, the DHS case manager assigned to the case before Yuen, both testified that visits by Navy personnel was part of the process in determining the Decedent's safety, but that those visits did not absolve DHS's responsibility for ensuring the Decedent's safety and were not a replacement for home visits. In fact, Yuen himself testified that he did not believe that there is a rule that would permit him to rely upon a federal, Navy social worker to conduct a home visit in place of his own home visits.

Section 4.7.1(B) of the Green Book states that "[o]ffice visits can . . . be used in place of monthly home visits if home visits are not possible or necessary on a monthly time table." The circuit court determined, however, that "the DHS social workers should not use office visits to replace the need for home visits as the DHS social worker will lose the advantage of seeing the child and the family in their own home environment, which allows for a better, more accurate assessment of the family functioning and safety."

The circuit court found in the unchallenged FOF 59, that "[m]onthly home visits are required by Section 4 of the Green Book." Yuen had office visits with the McVeighs, but made no home visits because he relied on the Navy social worker, to make home visits with the family. Polm's expert witness, Staples, determined that Yuen's failure to make any home visits

18

was below the standard of care for a case manager of the Decedent's case--a case which required hypervigilance. Based on the evidence in record, the testimony of Staples, and the requirements as set forth in the Green Book, the circuit court's determination that Yuen relied "excessively and improperly" on the home visits of the Navy social worker and office visits is not clearly erroneous. See Estate of Klink, 113 Hawai'i at 352, 152 P.3d at 524.

DHS also contends the circuit court's finding that "'the only possible explanation for [the broken arm] offered by the McVeighs (a motor vehicle accident) was medically ruled out as a possible cause of that injury' is completely wrong since the uncontradicted evidence was that the children's pediatrician concluded that it [sic] the broken arm more likely than not was the result of the Decedent's sister playing with him or the mother's inattention." DHS does not contend the McVeighs offered another possible explanation for how the Decedent broke his arm. Instead, DHS argues that the doctor "concluded" that the broken arm was a result of the Decedent playing with the Daughter or Mrs. McVeigh's inattention.

No doctor reached a conclusion as to what caused the Decedent injury, as DHS suggests. On October 21, 2008, Tripler Army Medical Center physician Tamara M. Grigsby, M.D. noted that "although the humeral fracture is indetermine in nature, the circumstantial information obtained in this case increases the likelihood that an unsupervised sibling or inexperienced, inattentive mother may have inadvertantly [sic] fractured the arm." (Emphasis added.)

Even assuming arguendo that the McVeighs offered additional explanations for how the Decedent could have broken his arm and assuming arguendo that the circuit court's finding overlooked those proffered explanations, we fail to see how such an error prejudiced DHS. The record indicates that, when the Decedent's case was first referred to DHS, not even DHS gave merit to the McVeighs' explanations because the Decedent's case was ultimately classified as a "confirmed threat of abuse or neglect" case. Any omissions as to other proffered explanations constitute harmless error. See HRE Rule 103(a).

19

11.   FOF 62

62.   Whether DHS employees truly and competently conducted home visits personally, deferred such responsibilities to Navy personnel, or conducted family visits in DHS's offices, if such regular, monthly visits were, indeed, performed competently by DHS or its agents, DHS should have noticed at least some of the signs of possible re-harm to [the Decedent] that babysitter [Cordona] reported on August 5, 2009.

| | | |
|---|---|---|
| 1. | Approx. July 5, 2009: | black eye; |
| 2. | Approx. June 21, 2009: | 1" L shaped bruise/red mark to right temple; and |
| 3. | Approx. June 21-28, 2009: | ½" bruise between right index finger and thumb, and a small bruise to right wrist. |

This means that from mid-June 2009 to mid-July 2009, no one from DHS observed [the Decedent] so as to notice what the babysitter reported on August 5, 2009 as signs of re-harm or injuries to [the Decedent]. Defendant DHS offered no explanation why the indications of injuries reported by [Cordona] were not observed by DHS and recorded or otherwise documented in DHS records. DHS failed in both its obligation to detect signs of possible re-harm or injury to [the Decedent] and to timely, properly, and accurately document, report, and record such possible re-harm or injuries in DHS's records. These failures fall below the standard of care for DHS that are established by law.

DHS contends that "[t]he [circuit court] treated the hearsay, belated reports of the babysitter as facts despite the actual facts that no medical personnel substantiated the babysitter's report, and during this period the DHS social worker conducted office visits on July 1 and July 23 (twice as frequently as required), and the Decedent went to the doctor for routine visits on July 20 and July 22." DHS contends that, contrary to the circuit court's finding in FOF 62, it did offer an explanation for why DHS did not discover signs of re-harm between mid-June and mid-July 2009. DHS contends that it did not observe indications of re-harm because the "injuries simply did not exist."

DHS stipulated to the admission of the DHS Log of Contacts from May 29, 2009 to September 21, 2009 into evidence, which included Cordona's August 5 Report of re-harm. "It is the general rule that evidence to which no objection has been made may properly be considered by the trier of fact[.]" See State v. Manipon, 2 Haw. App. 492, 497, 634 P.2d 598, 603 (1981). DHS

20

failed to raise a proper objection to the admission of Cordona's August 5 Report into evidence. Therefore, its argument on appeal fails. Id.

Furthermore, the circuit court's unchallenged FOF 28 noted that "[n]o evidence was introduced to dispute or contradict the veracity or accuracy of [Cordona's] report," which indicated that she saw bruises on the Decedent between mid-June and mid-July 2009. Given that the circuit court did not err in relying on her August 5 Report, DHS's argument that the court erred because DHS presented evidence contrary to the circuit court's findings also fails. See Inoue, 118 Hawai'i at 101, 185 P.3d at 849. FOF 62 is not clearly erroneous.

12. FOF 67

67. [The Decedent's] death would not have occurred if [the Decedent] were removed from his family by DHS. DHS did have the opportunity and authority to remove [the Decedent] from the McVeigh family after the [August 5 Report] of alleged re-harm or injury to [the Decedent] by his babysitter, [Cordona]. DHS negligently failed to discharge its duties owed to [the Decedent] in response to the [August 5 Report] by [Cordona].

DHS contends that "[t]here was no expert testimony to support the [circuit court's] speculation on what more likely than not would have happened based on the State's alleged negligence."

Polm's expert witness, Staples, testified that Yuen's lack of oversight "essentially . . . prevented others from following policy and from stepping in and possibly saving this child[.]" She described the Decedent's cases as a "case that cried out for hypervigilance" and that, "in [her] opinion, [the Decedent] should not have been returned to the parents, but if that had already occurred and then a social worker takes over that case, the social worker must be acutely aware of what were the issues that brought this case into court and into the agency." She believed that DHS has "skilled people" working there and an "array of services," but that Yuen failed to share the necessary information so that others could follow-up. FOF 67 is not clearly erroneous.

B. **The circuit court's COLs are not wrong.**

DHS challenges the following COLs: 12, 13, 16, 17, 18, 20, 21, and 28.

1.   COL 12

12.   DHS was also required to obtain a written psychiatric report, psychological report, or other multidisciplinary consultant team evaluation of the child, or appropriate family members when the actual or potential threat to the child is believed to be serious and one or more of the following conditions exist:

(1)   It is difficult to determine whether abuse or neglect has occurred[.]

. . . .

[DHS] shall make a social study of the child and family to determine:

(1)   Whether abuse, neglect, exploitation, or harm did or will occur;

(2)   The extent of or threat of harm to the child;

(2)   [sic] The potential risk of future or continued harm to the child[;]

(3)   If important changes need to take place in the family before the child may be expected to have safe and adequate care; . . .

. . . .

(8)   How much departmental supervision is needed . . . .

DHS contends the circuit court's "conclusion is directly contrary to the uncontradicted fact that DHS had obtained psychological examinations of both parents and the psychologist concluded that his 'only reservation about [Mrs. McVeigh's] ability to function effectively as a parent is the unexplained injury to her son,' and that he did 'not have reservations about [Mr. McVeigh's] ability to function effectively as a parent, other than the unexplained injury to his son.'" (Ellipses omitted.) DHS does not challenge the circuit court's determination that DHS was required to obtain a written psychiatric report, psychological report, or other multidisciplinary consultant team evaluation of the Decedent or other family members. Instead, DHS attempts to challenge whether it had met its responsibility to obtain such a report or evaluation. Because DHS presents no discernable argument against COL 12, DHS's contention is waived. See Kaho'ohanohano, 117 Hawai'i at 297 n.37, 178 P.3d at 573 n.37; see also HRAP Rule 28(b)(7).

2.    COL 13

> 13.   DHS has a duty in 2009, through September, to (1) provide [the Decedent] with competent, prompt, and ample protection from harm, (2) to prepare and maintain required information in DHS's records, and (3) to conduct an appropriate and professionally competent investigation pursuant to [HRS] Chapter 587 (the Child Protective Act), the [HAR], and the Green Book following the [August 5 Report] of apparent potential serious re-harm to [the Decedent] made by babysitter [Cordona].

DHS contends that "DHS complied with the [HAR] § 17-920.1-11(a) . . . by evaluating 'the report of complaint to insure that it is based on fact,' . . . and by taking 'action as soon as possible in order to provide immediate protection to the child.'"  DHS argues that it complied with the HAR because it "immediately contacted [the Decedent's] doctor's nurse and determined that the babysitter's report was unsubstantiated." DHS does not challenge what duties it owed the Decedent, as articulated in COL 13, but instead argues that it did not breach its duty.  Because DHS presents no discernable argument against COL 13, DHS's contention is waived.  See Kaho'ohanohano, 117 Hawai'i at 297 n.37, 178 P.3d at 573 n.37; see also HRAP Rule 28(b)(7).

3.    COLs 16 and 17

> 16.   DHS breached its duty to [the Decedent] to adequately investigate the report of apparent re-harm made on August 5, 2009 and failed to take adequate steps to protect [the Decedent] who at 13 months of age was defenseless and completely vulnerable to repeated abuse.

> 17.   DHS breached its duty to [the Decedent] to adequately investigate or otherwise evaluate the circumstances relevant to the [August 5 Report] of apparent re-harm, which report was received by DHS just one month before [the Decedent's] death.

DHS contends that it "immediately contacted [Mr. McVeigh] to take [the Decedent] to the doctor, learned that [Mr. McVeigh] had taken [the Decedent] one day earlier and confirmed with the nurse that no child abuse or neglect was noted."  The circuit court, however, found that "any statement of 'no abuse' that is attributed to [nurse] Lt. Barnes has no basis in fact and any reliance by DHS upon what Nurse [Lt.] Barnes is alleged to have stated was erroneous, baseless, ill-advised, and constituted malfeasance."  Because FOFs upon which the circuit court relied are not clearly erroneous, COLs 16 and 17 are not wrong.

4. COLs 18, 20, and 21

> 18. DHS breached its duties to [the Decedent] set forth in DHS's own Green Book requiring the DHS to perform a child risk assessment for [the Decedent] and to initiate a crisis intervention to protect [the Decedent] following the reports of severe harm, including a black eye to [the Decedent's] left eye observed in June 2009 and facial/head bruising to [the Decedent's] right eye/face observed in July 2009.

> . . . .

> 20. DHS failed to inform the VGAL of the report of apparent re-harm received on August 5, 2009. The VGAL kept careful notes of the location of the [June 19 bruise] suffered by [the Decedent] and would have been able to apprise DHS staff and social workers that the July 2009 black eye/bruising reported on August 5, 2009 to [the Decedent's] right face/head was a new injury and thus a crisis intervention, including calling 911 and removing [the Decedent] from the abusive home, should have been initiated.

> 21. DHS further breached its duty to protect [the Decedent], to take custody of and remove him from the McVeigh home, and to conduct a reasonable and competent investigation of the reports of suspected child abuse in the weeks leading up to the death of [the Decedent].

DHS contends that "[s]ince the babysitter's report was unsubstantiated by the doctor, DHS had no legal basis for taking any further action." DHS relied on Yuen's determination that Cordona's August 5 Report was "unsubstantiated" to support its argument that Yuen was not required to investigate or further assess reports of re-harm to the Decedent.

The Hawai'i Supreme Court in Kaho'ohanohano determined that the Child Protective Act,[4] the HAR,[5] and DHS's Green Book establish the level of care DHS owes to children under its supervision. Kaho'ohanohano, 117 Hawai'i at 297, 178 P.3d at 573. The circuit court determined that Yuen did not follow the Green Book procedures in determining whether Cardona's August 5 Report was substantiated or unsubstantiated. Instead, Yuen diverted from the procedures in the Green Book and conducted his own assessment of Cardona's August 5 Report that "placed near-exclusive, almost mechanical reliance upon a medical opinion of re-harm in order to determine whether he should initiate a new intake." The circuit court found that Yuen's approach "effectively defers the new intake initiation decision making to

---

[4] HRS §§ 587-1 et seq. (2006 Repl.) (repealed September 1, 2010).

[5] HAR §§ 17-920.1 et seq. (repealed December 9, 2010).

medical personnel, who in this case did not have the complete information if they did, in fact, examine [the Decedent] on August 5, 2009 pursuant to [Cordona's] report." Based on the medical opinion, Yuen determined the babysitter's report was unsubstantiated even though he was not trained in assessment, did not follow the standard Green Book procedure for assessing reports of re-harm, and did not consult with a DHS employee who was trained in assessment.

Polm's expert witness, Staples, testified that Yuen's response to the bruises reported in the August 5 Report fell below the required standard of care and was not reasonable given the high-risk nature of the Decedent's case. Furthermore, the circuit court found that Yuen's actions to be "an unacceptable departure from the qualitative process of data evaluation, investigation, and assessment of child safety that the Green Book establishes." Given that Yuen failed to follow even the minimal standard of care necessary to ensure the Decedent's safety by referring the case to a someone trained in assessment and failed to assess the credibility of the report of re-harm pursuant to established Green Book procedure, DHS's continued reliance on the report being "unsubstantiated" is misguided. Thus, COLs 18, 20, and 21 are not wrong.

5. COL 28

COL 28 concludes that "Defendant DHS's negligence was a legal cause of [the Decedent's] death." DHS contends that "[t]here was no expert testimony to support what more likely than not would have occurred but for the State's alleged negligence and thus the conclusion is not based on any evidence and instead is a mere expression of the court's constant speculation." (Emphasis omitted.) DHS's contention is false given that Staples, testified that departures from the standard of care were a factor in the Decedent's death and that the Decedent's death was avoidable had proper procedure been followed. Furthermore, Staples, testified that Yuen's lack of oversight "prevented others from following policy and from stepping in and possibly saving [the Decedent.]"

In Kaho'ohanohano, the Hawai'i Supreme Court stated that an "actor's negligent conduct is a legal cause or harm to another

if (a) his or her conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his or her negligence has resulted in the harm." Kaho'ohanohano, 117 Hawai'i at 305, 178 P.3d at 581 (quoting Mitchell v. Branch, 45 Haw. 128, 132, 363 P.2d 969, 973 (1961) (block quote format altered)). The circuit court was not wrong in concluding that DHS's negligence was the legal cause of the Decedent's death. COL 28 is not wrong.

C.    **Mr. McVeigh's criminal act was not an intervening, superseding cause of the Decedent's death, so as to limit DHS's liability.**

DHS contends that "[t]he intervening superseding criminal conduct of Mr. McVeigh was not reasonably foreseeable, thus the State cannot be liable for it."

Absent a special relationship, Hawai'i courts have been reluctant to extend liability when a third party's criminal act is involved. See Wolsk v. State, 68 Haw. 299, 301-02, 711 P.2d 1300, 1302 (1986) (holding that the state is not liable to victims of a third-party's criminal act when no special relationship exists between the State and the victim); Kau v. City and Cnty. of Honolulu, 6 Haw. App. 370, 373-74, 722 P.2d 1043, 1046-47 (1986) (holding that a municipality is not liable for criminal acts of third-party where there is no special relationship between the municipality and victim); Seibel v. City and Cnty. of Honolulu, 61 Haw. 253, 257-58, 602 P.2d 532, 536 (1979) (holding that the city has no duty to control the behavior of a third-party where there is no special relationship between city and victim). The Hawai'i Supreme Court has held, however, that when a defendant has a special relationship with the victim of a crime, the defendant has a duty to protect the victim from unreasonable risk of harm and is, therefore, liable for foreseeable criminal acts. See Knodle v. Waikiki Gateway Hotel, Inc., 69 Haw. 376, 386-87, 742 P.2d 377, 384-85 (1987) (holding that the hotel had a special relationship with a hotel guest so as to have a duty to protect the guest from any foreseeable criminal acts). The test to determine if a third-party's criminal act was foreseeable is whether "there is some

probability of harm sufficiently serious that [a reasonable and prudent person] would take precautions to avoid it." Id. at 388, 742 P.2d at 385 (internal quotation marks and citation omitted).

The supreme court has already determined, in Kaho'ohanohano, that there is a special relationship between DHS, DHS social workers and children suspected of abuse. The supreme court held that, based on the Child Protective Act and the regulatory mandates, the legislature "has created a duty flowing to children specifically identified to DHS as being the subject of suspected abuse." Id. at 290, 178 P.3d at 566. DHS is, therefore, "obligated to protect that specific class of children from a specific kind of harm that will likely continue if the statutory duty is ignored." Id. DHS's duty to the protected the class of children extends to third-party criminal acts, if such acts are reasonably foreseeable. See Knodle, 69 Haw. at 386-87, 742 P.2d at 384-85.

It is undisputed that the Decedent fell within the class of children DHS is statutorily obligated to protect and that DHS had a duty to prevent further abuse to him. See Kaho'ohanohano, 117 Hawai'i at 290, 178 P.3d at 566. The relevant question on appeal is whether Mr. McVeigh's criminal abuse of the Decedent was not foreseeable so to be an intervening superseding cause of the Decedent's death. See Knodle, 69 Haw. at 386, 742 P.2d at 384.

DHS argues that Mr. McVeigh's criminal actions were not foreseeable and, therefore, it should not be liable for the Decedent's death. In support of its argument, DHS reasons that "[f]rom [the Decedent's] birth until his death, Mr. McVeigh was cooperative, responsible, and regularly took [the Decedent] to the doctor if he seemed sick or injured" and, thus, DHS could not have anticipated that Mr. McVeigh would cause serious harm to the Decedent.

DHS was involved in the Decedent's case because in 2008 it recognized a probability of harm to the Decedent and became statutorily required to take precautions to avoid such harm. See Kaho'ohanohano, 117 Hawai'i at 290, 178 P.3d at 566. From the time the Decedent's case was opened until the time of his death, DHS determined that the perpetrator of the Decedent's 2008 broken

arm was unknown and considered both Mr. and Mrs. McVeigh, the Decedent's caregivers at the time, to be possible perpetrators of his harm.

Given the Decedent's vulnerable age when he suffered his broken arm and that his perpetrator remained unknown, the Decedent's case was deemed to be a particularly "high-risk case." Based on that understanding, DHS required that both Mr. and Mrs. McVeigh meet various conditions in order to reunite with the Decedent. The McVeighs also remained under DHS supervision up until the Decedent's death.

Polm's expert witness, Staples, testified that the Decedent's case was serious, so Yuen should have been "inquisitive" and "vigilant" of both Mr. and Mrs. McVeigh. She further testified that DHS placed too much focus on Mrs. McVeigh and not enough focus on Mr. McVeigh, especially given that the perpetrator of the Decedent's injury was unknown. Staples testified that Yuen considered Mrs. McVeigh as "the problem." Conversely, Mr. McVeigh was "cooperative" and "likeable," so Yuen "relied on [him]." Yuen saw Mr. McVeigh's cooperation as protection, but Staples testified that "to assume that one is not abusing their child because they're acting cooperatively with the social worker is in error." Staples also testified that "there were red flags" and "indicators" that Yuen should have picked up on or investigated, which he did not. Such red flags included the stress the father was under from his job, Mrs. McVeigh's methadone addiction, doctor reports that the McVeighs were inept at meeting the children's needs during doctor visits, and the nature of the August 4 doctor visit report, which Staples described as "concerning." Mr. McVeigh's criminal act was foreseeable and not an intervening superseding act so to limit DHS's liability.

**D.   The circuit court's award of general damages was supported by sufficient evidence.**

DHS challenges the circuit court's award of damages. The Hawai'i Supreme Court has stated that

> [a] finding of an amount of damages is so much within the exclusive province of the jury that it will not be disturbed on appellate review unless palpably not supported by the evidence, or so excessive and outrageous when considered with the circumstances of the case as to demonstrate that

the jury in assessing damages acted against the rules of law or suffered their passions or prejudices to mislead them.

Brown v. Clark Equipment Co., 62 Haw. 530, 536, 618 P.2d 267, 271-72 (1980) (quoting Vasconcellos v. Juarez, 37 Haw. Terr. 364) (1946). "A similar test is used in a jury-waived case and the inquiry on review is limited to whether, upon the evidence adduced, reasonable men could have come to the same conclusion as the jury, or the trial court in a jury-waived case." Kang v. Harrington, 59 Haw. 652, 663, 587 P.2d 285, 292 (1978) (citations and internal quotation marks omitted). This "test is the same whether general or punitive damages are concerned." Id. at 63, 587 P.2d at 292-93.

"General damages encompass all the damages which naturally and necessarily result from a legal wrong done." Dunbar v. Thompson, 79 Hawai'i 306, 315, 901 P.2d 1285, 1294 (App. 1995) (citing Ellis v. Crockett, 51 Haw. 45, 50, 451 P.2d 814, 819 (1969)). "Such damages follow by implication of law upon proof of a wrong and include such items as physical or mental pain and suffering, inconvenience, and loss of enjoyment which cannot be measured definitively in monetary terms." Dunbar, 79 Hawai'i at 315, 901 P.2d at 1294 (citations omitted); see HRS § 663-8.5 (1993)[6].

The circuit court determined that "the estate of [the Decedent] sustained general damages for conscious pain and suffering prior to his unresponsiveness on September 18, 2009 and the loss of enjoyment of life[.]" The circuit court awarded a total of $250,000 in general damages to Polm, as representative of the Decedent's estate, without indicating how much it was awarding for each class of general damages.

---

[6]  HRS § 663-8.5 provides

  **§ 663-8.5 Noneconomic damages; defined.** (a) Noneconomic damages which are recoverable in tort actions include damages for pain and suffering, mental anguish, disfigurement, loss of enjoyment of life, loss of consortium, and all other nonpecuniary losses or claims.

  (b) Pain and suffering is one type of noneconomic damage and means the actual physical pain and suffering that is the proximate result of a physical injury sustained by a person.

1.    Pain and Suffering

DHS contends that "[s]ince [the Decedent] lost consciousness almost instantly (based on the report of the medical examiner . . .), any claim for pain and suffering must be limited to damages for a few seconds of consciousness."

"[T]he question of damages for pain and suffering should be viewed as one of fact.  The jury must determine whether and to what extent conscious pain and suffering were sustained." Ferreira v. Gen. Motors Corp., 4 Haw. App. 12, 18, 657 P.2d 1066, 1071 (1983) (block quote format altered) (quoting Rohlfing v. Moses Akiona, Ltd., 45 Haw. 373, 397, 369 P.2d 96, 108 (1961), overruled on other grounds by Greene v. Texeira, 54 Haw. 231, 505 P.2d 1169 (1973)).  See Kang, 59 Haw. at 663, 587 P.2d at 292-93 (stating that the same analysis is used in a jury-waived trial).

The circuit court concluded that "[the Decedent] experienced conscious pain and suffering from the shaking or impact to which his father subjected him on or about September 18, 2009, which led to [the Decedent's] death two days later." Although the autopsy report indicated that the Decedent became "unresponsive at, or close to, the time he suffered his head trauma[,]" the circuit court determined that the Decedent "was old enough to experience the fright, pain, suffering, emotional duress and distress, confusion, and trauma that resulted from being physically attacked by his father, up until the time [the Decedent] was rendered unresponsive."  DHS did not challenge these conclusions.

The Hawai'i Supreme Court has determined that pain and suffering is measured by what the trier of fact "considers will reasonably compensate the plaintiff for the pain and suffering or anguish in light of the intensity and extend thereof as disclosed by the evidence." Barretto v. Akau, 51 Haw. 383, 394, 463 P.2d 917, 923 (1969) (ellipsis, citation, and internal quotation marks omitted).  Based on the conscious pain and suffering that the Decedent experienced prior to his unresponsiveness, the circuit court's award of pain and suffering was not erroneous.

2.    Loss of Enjoyment of Life

DHS contends that "since [the Decedent] lost consciousness almost immediately and there was no evidence of how he had enjoyed life or how he would have enjoyed life, only minimal damages could be awarded" for loss of enjoyment of life. DHS argues that, like damages for pain and suffering, damages for loss of enjoyment of life should also be limited "to the period between an injury and the loss of consciousness."

In Ozaki v. Ass'n of Apartment Owners of Discovery Bay, 87 Hawai'i 273, 954 P.2d 652 (App. 1998) aff'd in part, rev'd in part on other grounds by, 87 Hawai'i 265, 954 P.2d 644 (1998), this court specifically held that recovery for loss of enjoyment of life is available in wrongful death actions. Id. at 289, 954 P.2d at 668. This court noted that "[t]o hold otherwise would. permit one who is merely injured by a tortfeasor to recover damages for loss of enjoyment of life but prevent the estate of one who dies from his or her injuries from a similar recovery." Id.; see HRS § 663-7 (1993).[7] The court noted that

> [t]his view was vividly expressed in Jones v. Shaffer, 573 So.2d 740, 746 (Miss. 1990)(concurring opinion), which stated:
>
> > A person tortiously injured, and permanently disabled in consequence, may recover for the diminished joy of living. If this view does not hold for wrongful death cases, our law gives off unfortunate incentives. We invite the tortfeasor who runs over a pedestrian to back up and do it again and be sure his victim is dead.

Ozaki, 87 Hawai'i at 289, n.36, 954 P.2d at 668 n.36.

"[I]t is generally accepted that unless the survival statute limits damages, the recovery is the same one the decedent would have been entitled to at death." Id. at 288, 954 P.2d at 667 (brackets, citation and internal quotation marks omitted). DHS argues that a decedent's damages for loss of enjoyment of

---

[7]    HRS § 663-7 provides:

> § 663-7.  Survival of cause of action.  A cause of action arising out of a wrongful act, neglect, or default, except a cause of action for defamation or malicious prosecution, shall not be extinguished by reason of the death of the injured person. The cause of action shall survive in favor of the legal representative of the person and any damages recovered shall form part of the estate of the deceased.

31

life should, in fact, be limited by death.  Insofar as DHS's argument runs counter to our holding in <u>Ozaki</u>, we decline to adopt DHS's approach and hold that, under HRS § 663-7, a decedent's recovery for loss of enjoyment of life is not limited by death.

### IV.  CONCLUSION

The September 17, 2013 Final Judgment and the December 3, 2013 First Amended Final Judgment both entered in the Circuit Court of the First Circuit are affirmed.

DATED:  Honolulu, Hawai'i, December 30, 2014.

On the briefs:

Caron M. Inagaki
Randolph R. Slaton
Henry S. Kim
(on the reply brief)
Dana A. Barbata
Deputy Attorneys General
for Defendant-Appellant.

Paul V.K. Smith
Christopher A. Dias
(Schutter Dias & Smith)
and
John S. Carroll
for Plaintiff-Appellee.

Presiding Judge

Associate Judge

Associate Judge